```
                    IN THE UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF VIRGINIA
                            RICHMOND DIVISION

****************************
VANESSA MUNIZ GERENA,          *
                               *
          Plaintiff,           * CIVIL NO.: 3:24-CV-00098
                               * DATE: May 23, 2024   11:35 a.m.
                               * INITIAL PRETRIAL CONFERENCE
     vs.                       *
                               *
EQUIFAX WORKFORCE              * Before:
SOLUTIONS, LLC,                * THE HONORABLE M. HANNAH LAUCK
                               * UNITED STATES DISTRICT COURT JUDGE
          Defendant.           * EASTERN DISTRICT OF VIRGINIA
                               *
****************************
APPEARANCES:

For the Plaintiff:     DREW D. SARRETT, ESQUIRE
                       CONSUMER LITIGATION ASSOCIATES
                       763 J. Clyde Morris Boulevard, Ste. 1A
                       Newport News, Virginia 23601

                       STEPHEN FLORES, ESQUIRE
                       FLORES LAW, PLLC
                       530 East Main Street, Ste. 320
                       Richmond, Virginia 23219


For defendant Equifax Workforce Solutions, LLC:

                       ZACHARY McENTYRE, ESQUIRE
                       KING & SPALDING, LLP
                       1180 Peachtree Street, NE
                       Atlanta, Georgia 30309

                       MELISSA E. O'BOYLE, ESQUIRE
                       GENTRY LOCKE
                       101 W. Main Street, Ste. 705
                       Norfolk, Virginia 23510


Court Reporter:        Ruth A. Levy, RPR
                       701 East Broad Street
                       Richmond, Virginia 23219
                       804.916.2893


     Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.
```

1      (Court convened at 11:35 a.m.)

2           DEPUTY CLERK:  Case No. 3:24-CV-98, *Vanessa Muniz*

3  *Gerena versus Equifax Workforce Solutions, LLC*.

4           Plaintiff is represented by Drew Sarrett and Stephen

5  Flores.

6           Defendant is represented by Zachary McEntyre and

7  Melissa O'Boyle.

8           Are counsel ready to proceed?

9           MR. SARRETT:  Plaintiff is.

10           MR. McENTYRE:  Equifax is ready.

11           THE COURT:  All right.  Well, we're here for the

12  initial pretrial conference.  And I know, Ms. O'Boyle, you're

13  going to enter a notice of appearance.

14           MS. O'BOYLE:  Yes, Your Honor.  I apologize.  We were

15  on the answer, but I will enter an official notice.

16           THE COURT:  Yes, it's got to be separate.  So thank

17  you.

18           I normally -- and hopefully maybe sometime soon --

19  will be doing these back in chambers again.  I started this

20  with Covid, and I've continued it really out of an abundance of

21  caution.

22           But we're here to discuss the case.  And I want you

23  to be sure that you meet my staff.  And so I'm going to ask if

24  you-all could introduce yourselves, because these are the folks

25  you'll be talking to more than with me during the process.  So

 1    can you start?

 2           DEPUTY CLERK:  My name is Jessica Powell.  I'm the

 3    courtroom deputy clerk.

 4           THE COURT:  And we will have another Jessica in the

 5    future who will confuse you, but just remember Jessica.

 6    Actually, they're both fabulous.  So she'll be joining us soon;

 7    she's on vacation.

 8           Ruth?

 9           COURT REPORTER:  I'm Ruth Levy, the court reporter.

10           MS. DEVENDORF:  And I'm Lauren Devendorf, Judge

11    Lauck's term clerk.

12           MR. PETERSON:  I'm Jay Peterson, the court security

13    officer.

14           THE COURT:  All right.  So we all have seen each

15    other before, so I know you-all know the drill.  If you could

16    just report out to me what you think we need to cover in the

17    case and what your discussions have produced.  You may do this

18    seated, and just be sure to talk in the microphone so Ms. Levy

19    can hear you.

20           MR. SARRETT:  Your Honor, Drew Sarrett for the

21    plaintiff.  We had the Rule 26(f), in accordance with the

22    Court's order.  During that, we talked over a proposed schedule

23    for, one, plaintiff to notify defendant as to whether she'll

24    move to class certification and then also propose discovery

25    cut-off and expert disclosure dates.  And then we exchanged the

1    proposed schedule and there were a few revisions.

2         And I prepared an order for the Court's

3    consideration -- which I have provided to defense counsel and

4    they have signed off on -- that would just set out dates but

5    wouldn't completely supplant the Court's standard initial

6    pretrial order.  So I have that for the Court, if Your Honor

7    would like to take a look at it.

8         THE COURT:  All right.  Well, I want to understand.

9    Part of the defense here is that we may not be dealing with a

10   CRA.  And why are we doing all this if we're not dealing with a

11   CRA, even in part?  Why aren't we getting that out of the way?

12        MR. McENTYRE:  Your Honor, we certainly would agree

13   with prioritizing any discovery the plaintiff thinks is

14   necessary to determine whether the defendant is a CRA.  I think

15   the plaintiff's position is that that's a factual question as

16   opposed to a legal question.  I think they intend to conduct

17   some discovery on that issue.

18        But we agree, it is a threshold question; if the

19   defendant's not a CRA, then obviously the FCRA does not apply.

20   And we wouldn't have any objection to prioritizing that

21   discovery.

22        THE COURT:  Mr. Sarrett?

23        MR. SARRETT:  Your Honor, this case is -- I

24   understand the Court's concern, but this case is not really

25   akin to the *Scroggins* case in that sense, because the defendant

1    is acknowledging that it's a CRA.  When someone requests a

2    disclosure like maybe Ms. Muniz Gerena did, it provides the

3    disclosure.  When someone sends a dispute letter to EWS,

4    Equifax Workforce Solutions, there's an investigation and

5    there's a response provided.

6           And the underlying agreements that Equifax Workforce

7    Solutions enters into with its customers say that it's a CRA; I

8    mean, in this case, the data that was provided, the employment

9    data that was provided about Ms. Muniz Gerena to the Department

10   of Social Services was done under a contract that was entered

11   into by the Commonwealth of Virginia to provide this consumer

12   report information.

13          So, I mean, it's the defense du jour, obviously, to

14   claim you're not a CRA.  But this is not like a case where the

15   defendant disclaims in every single instance that it's a CRA

16   and it never provides any information that a CRA would provide.

17   And I mean, the disclosures that are provided to Ms. Gerena

18   acknowledge that defendant is a CRA.  So that, I think, is a

19   really tangential issue.

20          And we will heed what the Court's instruction is, but

21   I don't see how the defendant can actually succeed on that.

22          THE COURT:  Well, your paragraph 19 in your answer

23   says that you act as a consumer reporting agency in some

24   circumstances but deny that you're always acting as a consumer

25   reporting agency.  What the heck does that mean?

1          MR. McENTYRE:  Your Honor, it is a complicated issue.

2     And I agree with Mr. Sarrett that it is intertwined with the

3     facts of the case because the definition of consumer reporting

4     agency, under the statute, depends on whether the information

5     provided constitutes a consumer report.

6          And a company like EWS may provide information, in

7     some instances, that is a consumer report, but in other

8     instances, the information is not a consumer report.  And it

9     depends on a number of variables, such as what the information

10    is, the purpose for which it's collected and provided; those

11    are fact-bound questions.

12         And I think there is precedent, and I'm not going to

13    recall it off the top of my head, but there is precedent for

14    the notion that a company may be a CRA for one purpose but not

15    for another.  Equifax, generally, not just EWS, but Equifax

16    generally obviously provides a lot of different informational

17    products.  Some of those are clearly FCRA regulated; some are

18    not.  And there are some where I think there is a good faith

19    dispute between the parties as to whether they are or not.

20    Here, I think that's the issue; what exactly were we providing?

21    What were we saying?

22         THE COURT:  So you're going to have to give me a more

23    concrete example.  What's a non-FCRA and what's an FCRA

24    product?

25         MR. McENTYRE:  So a clearly FCRA product is a report

1    about, for example, a consumer's credit history that Equifax

2    provides to a potential creditor so that the creditor can

3    assess whether or not that consumer qualifies for a particular

4    credit product, right; that would be a classic example of an

5    FCRA-regulated product.

6             A non-FCRA regulated product would be directional

7    information that Equifax or one of its affiliates provides.  So

8    in other words, Equifax may compile information and provide it

9    to a third party, but it is not representing that this

10   information is in fact the information about this person; it is

11   intended as a starting point for Equifax's customer to do its

12   own investigation, to reach its own conclusion about whether

13   that person qualifies for employment or for credit.

14            And there's a key distinction, because a consumer

15   report is only a consumer report if it is intended to be relied

16   upon for the purpose of assessing creditworthiness or

17   employability.  If that's not the purpose -- and both Equifax

18   or its affiliate and the end user of the product know that's

19   not the purpose -- then that is not a consumer report.  And as

20   a result, Equifax or its affiliates is not acting as a

21   reporting agency when it provides that information.

22            THE COURT:  So, like, I don't know what you mean by

23   "directional information."

24            MR. McENTYRE:  So, for example, I think in this case

25   the allegation is that Equifax provided a report that included

1    information about where people with a name similar to the

2    plaintiff's name have lived within a certain period of time.

3    If Equifax is not representing that in fact it was this person

4    who lived in all of those place, Equifax is not representing

5    that we're talking about this plaintiff.  It's just saying we

6    have conducted a basic search to try to find background

7    information about people with similar characteristics, similar

8    name, similar date of birth, something like that, and it

9    provides it to the end user; that is not, in our view, a

10   consumer report.

11         THE COURT:  So if you provide -- if you're actually

12   saying it's probably or could be inaccurate, that's what makes

13   it not a credit report?

14         MR. McENTYRE:  We're not saying -- we're not making a

15   representation that the information is about this plaintiff.

16   The request from the end user is not, as in the context of a

17   classic consumer report, tell me factually all of the

18   information you have about this person.  The request from the

19   end user is we are doing a background investigation and we need

20   to -- somebody needs to help us do the first stage of the

21   research to then help us assess whether this person is who he

22   or she says she is.

23         So we're not saying the information is inaccurate;

24   it's not a matter of accuracy or inaccuracy.  There was --

25         THE COURT:  But you're assuring the accuracy, right?

1    So you're giving yourself the out, but it could be.

2         MR. McENTYRE:  We're not being asked to assure the

3    accuracy.  We're not being asked to provide actual information

4    that's accurate or inaccurate.  There's an Eleventh Circuit

5    case called *Lohse* which is directly on point.  In the *Lohse*

6    case, the plaintiff had applied to be a Little League coach and

7    the defendant had provided the Little League with a background

8    report about the plaintiff that said someone with

9    characteristics similar to his was a sex offender.  It turned

10   out the person with characteristics similar to his was his

11   father, his estranged father.

12        The Eleventh Circuit said, as unfortunate as that

13   course of events may have been, that document, the information

14   that was provided was not inaccurate.  As I recall -- I can't

15   recall off the top of my head if the Eleventh Circuit reached

16   the CRA versus non-CRA distinction, but it was an issue in the

17   case.  And it's related to the accuracy question, what are you

18   representing?  If you're not representing that these are the

19   exact facts about this person, if that's not what you were

20   asked to present, that may not be a consumer report.

21        THE COURT:  So in the -- is it *Lohse* case? -- was it

22   Equifax or TransUnion or Experian that was reporting it or

23   somebody else?

24        MR. McENTYRE:  No, I'm not going to remember the

25   name.  It was a specialty background check company.

 1            MR. SARRETT:  Your Honor, I don't want to interrupt

 2     his flow, but that case is actually *Erickson v. First*

 3     *Advantage*; the *Lohse* case is not the case that is being

 4     discussed.

 5            MR. McENTYRE:  I appreciate Mr. Sarrett's

 6     clarification.  I have *Lohse* on the brain for a different

 7     matter.

 8            THE COURT:  That's okay.

 9            MR. McENTYRE:  All the FCRA cases sometimes meld in

10     my head.  But it is the *Erickson* case that I'm thinking about.

11            MR. SARRETT:  And First Advantage is a background

12     screening company.

13            MR. McENTYRE:  Which, Your Honor, is the same

14     business that Equifax Workforce Solutions is in.  So it's

15     important to note that the defendant in this case is not

16     Equifax Information Solutions, which for, I think we would

17     acknowledge, almost all purposes if not all purposes -- not

18     quite all, but most purposes -- is a CRA.  I know Your Honor's

19     had many cases with Equifax Information Services as a defendant

20     and you've not heard that entity argue it is not a CRA because

21     the vast majority of the products it provides are consumer

22     reports.

23            Equifax Workforce Solutions is a different affiliate.

24     It is a different business which is more akin to a background

25     screening type product than a traditional financial consumer

1    report.

2            THE COURT:  But it does provide consumer reports,

3    which presumably -- does First Advantage provide consumer

4    reports, too?

5            MR. McENTYRE:  Yes.  Sometimes they are; sometimes

6    they're not.  It's a fact-bound -- that's why the analytical

7    inquiry starts with whether the actual information was a

8    consumer report.  Because the answer to that question informs

9    whether the defendant is a CRA.  The fact that a company is a

10   CRA for most purposes, there is no sort of CFPB authorized list

11   that says "these companies are factually CRAs for every

12   purpose."  It's not a factual question; it's a legal question

13   that is fact-bound.

14           MR. SARRETT:  May I respond?

15           THE COURT:  Yes.

16           MR. SARRETT:  First of all, the CFPB does publish a

17   list of consumer reporting agencies.  I could pull it up and

18   show it to the Court, but I'm not confident that EWS is on it.

19           Second, the Court is probably all too familiar with

20   this issue that we're discussing.  The seminal case on consumer

21   reporting and whether an entity is a consumer reporting agency

22   and whether or not a particular piece of information or

23   collection of information constitutes a consumer report is this

24   *Yang v. Government Employees Insurance Company* from the

25   Eleventh Circuit that's obviously an issue in *Scroggins*.

1        But the fundamental problem for defendant's argument

2   goes beyond this case law.  The defendant entered into a

3   contract with the Commonwealth of Virginia.  And I'm reading

4   from the contract.  And what it says is, "The contractor" --

5   that's EWS -- "shall provide verification, employment, and

6   income information services as set forth herein.  Under this

7   contract and only with the permissible purpose under the Fair

8   Credit Reporting Act, purchasing agency and its eligibility

9   workers for local departments of social services will be able

10  to access this data to verify employment ranges and employment

11  terminations for applicants and recipients of TANF, SNAP,

12  Medicaid, and other public assistance programs."

13       I didn't read out the words that make up the acronyms

14  for TANF or SNAP, but the rest of what I said was directly from

15  the contract.

16       So I understand that they're making this argument.

17  It will fail for multiple reasons.  The first one being that

18  they agree that they're a CRA.  But I don't think it should

19  waylay full discovery and class certification.

20       MR. McENTYRE:  Your Honor, may I briefly respond?

21  First, I understand that CFPB has a list; I think we actually

22  cited the case in a case we had in front of Your Honor about

23  ten years ago in a motion to dismiss, which Your Honor denied.

24  There's no question that CFPB has a list.

25       My point is that I think it's -- I'm not going to say

1    Your Honor held it -- but our argument was that our defendant

2    in this case was not on the list and therefore was not a CRA.

3    And I think Mr. Bennett's argument was that list is not

4    dispositive.  I'm simply making the same point.

5            A company might be on the list because some of its

6    products are consumer reports, but that doesn't mean all of

7    them.  That's the point I'm trying to make.  I understand the

8    contract says what Mr. Sarrett said.  It's not all the contract

9    says.

10           And to go back to Your Honor's original question, we

11   have not proposed any sort of staggering of discovery to

12   prioritize this issue; there are many other issues, including

13   the accuracy of the information that was provided within the

14   specific context of the report that was provided.  There's a

15   lot of other issues that we'll need to litigate.  And some of

16   those may very well overcome this issue and this may not even

17   be a defense that we ultimately raise in a motion for summary

18   judgment.

19           I was simply agreeing that if Your Honor thought it

20   would be more efficient to deal with this issue first, we don't

21   have any problem with that.  We haven't proposed it.  And I

22   think, as we've proposed in the joint schedule, I think it

23   might be just as efficient to deal with some of the other

24   issues and to see the progress we make on those and whether

25   those create some opening for an off-ramp of litigation or

1    earlier briefing of summary judgement or -- and I think this is

2    flagged in the schedule -- for plaintiff to decide whether they

3    intend to seek class certification.  As we understand it,

4    that's not a decision that they've made.  And that's the first

5    deadline in the schedule.

6          So I think it would be every bit as efficient -- and

7    I think this is what the parties envisioned -- for the parties

8    to do the discovery necessary for the plaintiff to decide

9    whether to seek class certification.  If the plaintiff decides

10   not to seek class certification, as we all know from

11   experience, these cases have a tendency to resolve.  If the

12   plaintiff does seek class certification, we're in a very

13   different environment.

14         THE COURT:  All right.  Well, that's a helpful

15   discussion.  What I don't want is a significant amount of

16   sideways movement as far as discovery or focusing on issues

17   that are or are not brought to the Court.

18         And so let me say this:  You say the cutoff is

19   February 3rd and by September 23rd, the plaintiffs will provide

20   notice.  I'm going to be honest with you guys:  You-all blow

21   deadlines a lot.  I'm just going to say it.  So what do I do if

22   that's the case?  And the deadline blowing tends to be in

23   discovery disputes.

24         MR. SARRETT:  Well, Your Honor, hope springs eternal

25   for us that not we're not going to have one of these

1    knock-down, drag-out discovery fights.  We've had a

2    discussion -- one of the issues in this case and one of the

3    issues that came up in the Rule 26(f) is we don't know a lot

4    about EWS's business because we haven't litigated against them

5    specifically.  Equifax is a different story.

6          And what we discussed during the Rule 26(f) was how

7    about we try and move quickly to have an exchange of documents

8    and information to see whether there's going to be big fights

9    in discovery over some of these issues; for instance, whether

10   the FCRA even applies or other issues related to class

11   certification.  And I think we have a tentative agreement on

12   that to do that.

13         But, unfortunately, from the plaintiff's perspective,

14   until we start seeing what comes in, we don't know if we're

15   going to have to fight over every single thing.  We hope we

16   don't.  But if the Court is amenable to pushing back some of

17   these deadlines, plaintiff has no issue with that.

18         THE COURT:  I'm not talking about pushing back

19   deadlines.  I'm talking about meeting deadlines.  I've been

20   given a lot of these kinds of orders.  And they can be rendered

21   meaningless with some regularity.  And if you-all have some

22   kind of discovery issue, some kind of issue of fact that you

23   need to resolve, be honest about it with me.  Don't give me

24   stuff you're not going to meet.

25         You-all can try whatever case you want, but try the

1    case you're telling me you're trying.  Don't try the case you

2    think might be the best case scenario, because it's a waste of

3    my time.  I'm here to make decisions.  But I am not here to

4    watch parties go back and forth about big and little issues

5    when the big issues are the ones that need to be resolved and

6    you're not teeing them up.  I'm not doing that anymore for you

7    guys.  So that's a problem.

8           MR. SARRETT:  Your Honor, as Your Honor's pointed

9    out, the delays are often encountered in discovery and

10   getting --

11          THE COURT:  Which you're giving me the clue-up right

12   now, Mr. Sarrett:  "Well, they're not going to give me

13   information about whether or not they're a CRA."  "They're

14   holding back on stuff."  "We haven't litigated against them."

15   "We don't know how it works."

16          They're going to say they're giving you the

17   information; that's a dispute.  It's going to come in front of

18   me.  Don't pretend like it's not going to if you are pretty

19   sure it will.  So from February of '24 to September of '24 --

20   then I have to do months -- seven months where you find out you

21   actually have a fight.  That's what you're proposing to me.

22          MR. SARRETT:  Your Honor, in order -- in any case in

23   which we're trying to get a class certified, we have to have

24   certain information and documents to be able to do that.  And

25   we will work with defense counsel to get that.

1      I think the Court's concern is that there's going to
2   be a delay in that happening, and then there's going to be a
3   fight, and then all these deadlines are going to have to be
4   pushed back.  My suggestion, respectfully, to resolve -- or try
5   and avoid that scenario is to put in place some framework where
6   we have no choice but to present any issues to the Court
7   rapidly.  And the Court could do that in several ways, one of
8   which could be if the Court wants to refer it to one of the
9   magistrate judges and we go ahead and set a schedule where we
10  report and handle it that way.
11      The other option would be -- and it might not work in
12  this case -- but in certain of Judge Payne cases, we have a
13  telephone conference whenever there's a dispute, and if the
14  Court can't resolve it during that telephone conference, then
15  we have an expedited process for dealing with it.  I think
16  that's the real concern; it's a legitimate concern that the
17  Court has.
18      And we are not trying to give Your Honor an order
19  that we know we can't comply with; we're hoping we will get the
20  information and documents.  But I think if we have a framework
21  in place to go ahead and deal with disputes -- are there going
22  to be disputes?  Probably, because if -- there's a lot at stake
23  in the litigation and there's going to be fights over certain
24  issues.  But if we have a framework to try and resolve them
25  quickly, I think that that would help us keep things moving

1     along.

2            THE COURT:  Well, why are you focusing on whether or

3     not you're going to certify a class?  How is that separate from

4     the CRA issue?

5            MR. SARRETT:  The defendant proposed the notice

6     period, that we provide them notice.  And we had no issue with

7     that.  We thought it was reasonable, if they wanted us to do

8     that, that we would agree with it.

9            I don't think the CRA issue looms in this case

10    substantively; I really don't.  I think there may be other

11    issues of identifying individuals and that sort of thing,

12    getting the information and documents out of databases from

13    EWS, but I don't know that we're going to have -- I don't think

14    we're going to have this merits fight over CRA status that's

15    going to drive the entirety of the litigation.  But I do think

16    it's a good idea to have a framework in place for us to be

17    reporting to the Court on issues --

18           THE COURT:  Well, you know, Mr. Sarrett, here's the

19    thing:  I am here to make decisions.  I am here to have lawyers

20    fight hard but also reasonably.  We have two magistrate judges.

21    And they can work full time on your cases.  I can work full

22    time on your cases.  And then we can ignore the other 199 cases

23    that we cover.  Or not.

24           You two, in my period here, have worked really well

25    together.  And you've stopped working together.  I don't know

1   why.  But I can tell you I'm not doing a hundred percent FCRA

2   cases a hundred percent of the time and I'm not making my

3   magistrate judges do it because you guys stopped getting along.

4          I don't know what is going on with you.  But given

5   the outcome, given the amount of time, given the number of

6   cases that have been involved, it's not rationally explicable.

7   Something is up.  So I'm putting you-all on notice about this.

8   I don't like any kind of litigation where it gets down to

9   spitting contests.

10         So you-all are the preeminent lawyers in this area of

11   the law in the nation.  And I'm probably as educated a judge,

12   this Court is about as educated a set of judges as you're ever

13   going to get, but it does not mean that you just keep coming

14   in, saying you're going to do something, and then not doing it.

15         So I am aware that there is a lot of passion

16   involved, but it cannot drive rational business decisions and

17   legal decision-making.

18         MR. McENTYRE:  Your Honor, can I just say one thing?

19         THE COURT:  Yes.

20         MR. McENTYRE:  I'm sorry to interrupt you.  And I

21   apologize if this is not helpful, but I did want to provide

22   some context.  So our firm does not represent Equifax in its

23   single-plaintiff cases, and I really don't know what happens;

24   we handle the class actions.  And we have not had a class

25   action against Mr. Bennett's firm that got into any real

1    discovery disputes in a number of years.  So in the class

2    actions, at least, which is really all I know about, we all

3    have continued to have, I think, a very productive working

4    relationship and we've avoided some of the problems that we had

5    ten years ago or so.

6           So I only wanted to provide that context.  Obviously,

7    Your Honor would not be expected to know which lawyers handle

8    which cases, but to the extent there's been a problem with a

9    lot of the Equifax cases with Mr. Bennett, our firm has not

10   been involved in those and I don't have any idea what's going

11   on.

12          We remain committed to having the same productive

13   working relationship we've had with Mr. Bennett and avoiding

14   overtaxing the Court's time for the last several years.

15          THE COURT:  Okay.  I'm going to enter this order.

16   But you are going to report to me as well on September 23rd

17   about what the status is of the class certification.  And I'll

18   enter whatever order I believe is necessary based on my initial

19   pretrial order.  I will set these deadlines.  I haven't looked

20   at my calendar; I don't know if I have other deadlines that

21   might require a day or two or a week or two off on this, but

22   I'll just enter them as I see fit.

23          I do hope that this remains, the relationship you've

24   had.  But I can tell you, Mr. Sarrett, I try my cases.  I don't

25   try Judge Payne's cases.  I do my docket the way I do my

Gerena v. EWS - 5/23/24                         21

1  docket.  And I have been very successful doing it my way.  And

2  if litigants are unproductive in what they do, it doesn't mean

3  I change.

4          MR. SARRETT:  Your Honor, I apologize; I was in no

5  way --

6          THE COURT:  I don't want to hear it, Mr. Sarrett.  I

7  knew what you meant.

8          MR. SARRETT:  Your Honor, I did not mean in any way

9  to insinuate that there was something -- all I was asking was

10 that if there was a framework in place --

11         THE COURT:  I have my framework.  What I was saying

12 is you have not been meeting my framework, and I want you to

13 start meeting it.  That's what I said; that's all you had to

14 hear.

15         MR. SARRETT:  The only thing I was hoping to do was

16 just have a schedule in place so that we absolutely had to

17 report or provide information so that there was no way in which

18 we would be delaying anything and not doing charts and that

19 sort of thing.  That's all I was proposing.  Not that it needed

20 to be changed from the charts or anything of that matter and I

21 certainly --

22         THE COURT:  You said unless I wanted to take calls

23 like Judge Payne did.  Listen, think about what you're saying,

24 Mr. Sarrett.  And you know -- can you look at me, please?  I

25 don't talk like this very often.  I never talk to lawyers as

1    expert as you are very often, if at all, like this.

2              Please just hear what I'm saying.  Just meet these

3    deadlines.  And I change the deadlines if they need to be

4    changed, reasonably.  Okay?

5              MR. SARRETT:  Yes, Your Honor.  I apologize; I did

6    not mean to offend the Court in any way.

7              THE COURT:  I'm not offended; I'm disappointed.  Just

8    try your cases.

9              All right.  I'm going to enter this order, and I will

10   change it to the degree that I will require a report to the

11   Court on September 23rd.  All right.

12        (Court concluded at 12:12 p.m.)

13

14

15

16                            **CERTIFICATE**

17        I, Ruth A. Levy, RPR, certify that the

18   foregoing is a correct transcript from the record of

19   proceedings in the above-entitled matter.

20

21   /s/  Ruth A. Levy, RPR                Date:  06/10/2024

22

23

24

25